82 A.3d 336

GARDEN STATE EQUALITY; DANIEL WEISS; JOHN GRANT; MARSHA SHAPIRO; LOUISE WALPIN; MAUREEN KILIAN; CINDY MENEGHIN; SARAH KILIAN MENEGHIN; ERIC BRADSHAW; TEVONDA BRADSHAW; TEVERICO BRAD- SHAW; KAREN NICHOLSON MCFADDEN; MARCYE NI- CHOLSON MCFADDEN; KASEY NICHOLSON MCFADDEN; MAYA NICHOLSON MCFADDEN; THOMAS DAVIDSON; KEITH HEIMANN; MARIE HEIMANN DAVIDSON; AND GRACE HEIMANN DAVIDSON, PLAINTIFFS, v. PAULA DOW, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF NEW JERSEY; JENNIFER VELEZ, IN HER OFFICIAL CA- PACITY AS COMMISSIONER OF THE NEW JERSEY DEPART- MENT OF HUMAN SERVICES; AND MARY E. O'DOWD, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF HEALTH AND SENIOR SER- VICES, DEFENDANTS.

Superior Court of New Jersey
Law Division
Mercer County

Decided September 27, 2013.

less crime-ridden locales. Even the most upscale of neighborhoods and shop- ping centers are troubled by crime. Moreover, as we have endeavored to explain, the risk to the child is not limited to exposure to criminality; the health risks of leaving a young child in an unattended motor vehicle no doubt produce more deaths or greater injuries than those caused by criminals.

*Lawrence S. Lustberg* (*Gibbons, P.C.*) argued the cause for plaintiffs (*Hayley J. Gorenberg* (*Lambda Legal* ) of the New York bar, admitted pro hac vice, on the brief).

*Kevin R. Jesperson,* Assistant Attorney General, argued the cause for defendants (*John J. Hoffman,* Acting Attorney General, attorney; *Jean P. Reilly,* Deputy Attorney General, on the brief).

*Ronald K. Chen* (*Rutgers Constitutional Litigation Clinic Center for Law and Justice* ), for amici curiae (*Edward Barocas* (*American Civil Liberties Union of New Jersey Foundation* ), of counsel and on the brief).

JACOBSON, A.J.S.C.

## INTRODUCTION

Plaintiffs, a lesbian, gay, bisexual, and transgender (LGBT) rights organization called Garden State Equality, and six same-sex couples and their children, ask this court to enter summary

judgment in their favor, by holding that the guarantees of equal protection contained in both the New Jersey and United States Constitutions require that civil marriage be extended to same-sex couples in New Jersey. Plaintiffs seek a ruling as a matter of constitutional law, not on the basis of a factual record, which is as of yet incomplete, but as a legal matter following the United States Supreme Court's decision in *United States v. Windsor,* — *U.S.* ——, 133 *S.Ct.* 2675, 186 *L.Ed.*2d 808 (2013), which struck down the federal Defense of Marriage Act (DOMA), 1 *U.S.C.A.* § 7. *Windsor* held that the federal government must extend federal marital benefits to same-sex couples who are lawfully married in states that have granted same-sex couples the right to civil marriage. Since New Jersey offers same-sex couples civil unions and not marriage, plaintiffs claim that their status as civil union couples now deprives them of all the rights and benefits of marriage guaranteed to them under the New Jersey Constitution as interpreted by the New Jersey Supreme Court in *Lewis v. Harris,* 188 *N.J.* 415, 908 *A.*2d 196 (2006), and violates the federal Constitution as well. Defendants ("the State") oppose the relief sought, essentially arguing that any deprivation caused to New Jersey civil union couples derives from the actions of the federal government and not from action by the State, which continues to provide equal marital rights and benefits to same sex couples though the Civil Union Act, *N.J.S.A.* 37:1–28 to–36. At the heart of the dispute is whether the rationale of *Lewis* requires extending civil marriage to same-sex couples in the wake of *Windsor.*

Whether there is a constitutional right to same-sex marriage is a debate that elicits strong responses from litigants, attorneys, and the public. The debate has also generated many close decisions by the courts—including the cases the parties rely upon heavily to make their arguments. *Windsor* was a 5–4 decision of the United States Supreme Court. While the New Jersey Supreme Court unanimously found that same-sex couples were entitled to all the rights and benefits of marriage in *Lewis,* the Justices split 4–3 as to whether same-sex couples had a fundamental right to marry under the State Constitution, with the majority

finding no such fundamental right. Even the New Jersey Supreme Court's decision not to hear a motion in aid of litigant's rights in *Lewis*, following a report by the Civil Union Review Commission, led to a 3–3 vote of the Justices. The closeness of these decisions reflects the analytic difficulties faced by courts grappling with the sensitive legal and societal issues raised by these cases.

Justice Albin's opinion in *Lewis* focused on detangling the concept of entitlement to the rights and benefits of marriage from the right to the label of marriage, and limited the decision to the holding that same-sex couples are entitled to all of the rights and benefits of marriage regardless of what the New Jersey Legislature decided to call the same-sex union. *See Lewis, supra,* 188 *N.J.* at 451, 908 *A.*2d 196. The dissenters in *Lewis*, however, would have granted same-sex couples the right to marry in addition to providing the rights and benefits of marriage. Now this court must decide whether the label of marriage can no longer be withheld from same-sex couples—a label that has taken on new significance in light of the *Windsor* decision. While the Court in *Lewis* focused on equality of rights and thus did not address "the transformation of the traditional definition of marriage," that definition is now squarely before this court. *Lewis, supra,* 188 *N.J.* at 451, 908 *A.*2d 196.

As noted in *Lewis*, rather than presume the correct legal structure to implement its decision, the Court deferred to the New Jersey Legislature to determine whether to amend the marriage statute to include same-sex couples or to create a separate statutory structure to afford same-sex couples all the rights and benefits of marriage. *Id.* at 457–58, 908 *A.*2d 196. The Legislature chose to create a parallel legal structure and to call the relationship a civil union. The ways in which same-sex unions have been implemented throughout the country have been varied. In some states, same-sex marriage was enacted through legislative action. *See* 79 *Del. Laws* 19 (2013); 2013 *Minn. Laws* 74; 2009 *N.H. Laws* 60 (codified in scattered sections of ch. 457 of *N.H.Rev.Stat. Ann.*);

*N.Y. Dom. Rel. Law* § 10–a (Consol.2011); 2013 *R.I. Pub. Laws* 4; 2009 *Vt. Acts & Resolves* 3. In other states, courts interpreted their constitutions to require same-sex marriage. *See In re Marriage Cases*, 43 *Cal.*4th 757, 76 *Cal.Rptr.*3d 683, 183 *P.*3d 384 (2008) [1]; *Kerrigan v. Comm'r of Pub. Health*, 289 *Conn.* 135, 957 *A.*2d 407 (2008); *Varnum v. Brien*, 763 *N.W.*2d 862 (Iowa 2009); *Goodridge v. Dep't of Pub. Health*, 440 *Mass.* 309, 798 *N.E.*2d 941 (2003). Recently, same-sex marriage was approved by popular vote in three states. *See* Erik Eckholm, *In Maine and Maryland, Victories at the Ballot Box for Same–Sex Marriage*, N.Y. TIMES, Nov. 7, 2012, at P14; *Gay Marriage Approved by Wash. Voters*, WASHINGTON POST, Nov. 9, 2012, at A12. And, in addition to New Jersey, two other states currently grant same-sex couples civil unions that provide all or substantially all of the benefits of marriage. *See Colo.Rev.Stat.* § 14–15–102 to–119 (2013); 750 *Il. Comp. Stat.* 75/1 to 75/90 (2013). Many of the states that now have same-sex marriage previously provided for civil unions. The landscape in 2013 is markedly different from the one that existed just seven years ago when *Lewis* was decided.

Many cases involving the right to same-sex marriage have raised thorny procedural issues, particularly as to standing and justiciability. *See Hollingsworth, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 2668, 186 *L.Ed.*2d at 785 (holding that proposition backers did not have standing to defend California's anti-same-sex marriage referendum); *Windsor, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 2688, 186 *L.Ed.*2d at 822 (holding that the Bipartisan Legal Advocacy Group had standing to defend DOMA). This case is no exception—the court must be sure that the case is justiciable and properly before the court before it can rule on the merits of plaintiffs' motion. In addition to justiciability concerns, the *Windsor* Court also addressed difficult issues of federalism. Here too,

---

[1] This case was overturned by a popular referendum, known as Proposition 8, that amended the California Constitution to allow marriages only to opposite-sex couples. However, Proposition 8 was later ruled unconstitutional. *See Hollingsworth v. Perry,* —— *U.S.* ——, 133 *S.Ct.* 2652, 186 *L.Ed.*2d 768 (2013).

threads of federalism are woven throughout this motion, where plaintiffs are asking a state court to find that a state statutory structure is now illegal under the state constitution as a result of actions taken at the federal level.

The court is also faced with some rather complicated state action concerns. Plaintiffs argue that there is clear state action, maintaining that the State created a label distinct from marriage, and that this label is the cause of significant deprivations to plaintiffs. The State, on the other hand, asserts that the only action it was required to take under *Lewis* was to enact a statute extending the full panoply of rights and benefits of civil marriage to same-sex partners in an area—domestic relations—where the state has primacy and discretion to decide what rights to make available and what label to give to those rights. The State argues that the Civil Union Act met the mandate of *Lewis* and fulfills the State's obligations under the equal protection guarantees of the New Jersey and federal Constitutions. In regard to the state action arguments in particular, many of the issues that arise in this case are not only complex, but also unique. As a result, there is a dearth of helpful precedent to guide the court in making its decision. It is into this tangled thicket that this court must venture to resolve the issues raised by plaintiffs' motion.

## *PROCEDURAL HISTORY*

This matter comes before the court by way of a motion for summary judgment filed by plaintiffs, Garden State Equality and six same-sex couples and their children, against defendants, the Attorney General of New Jersey, the Commissioner of the New Jersey Department of Human Services, and the Commissioner of the New Jersey Department of Health and Senior Services.[2]

---

[2] At the time this lawsuit was initiated, Paula Dow was the Attorney General of New Jersey. However, as of this writing, John J. Hoffman is the Acting Attorney General for the State of New Jersey. Jennifer Velez remains the Commissioner of the New Jersey Department of Human Services, and Mary E. O'Dowd is the Commissioner of the New Jersey Department of Health and Senior Services.

Defendants are responsible for implementing, administering, and enforcing the statutory scheme that, in plaintiffs' view, unconstitutionally denies them the right to marriage. Defendants were sued in their official capacities, and therefore simply stand as an alter ego of the State. As such, the court will refer to defendants collectively as "the State."

## I. *Lewis v. Harris.*

Plaintiffs filed this case to obtain a declaratory judgment that the exclusion of same-sex couples from civil marriage violates Article I, Paragraph 1 of the New Jersey Constitution and the Fourteenth Amendment of the United States Constitution. In 2006, the Supreme Court of New Jersey, in *Lewis, supra,* 188 *N.J.* at 463, 908 *A.*2d 196, held that:

> To comply with the equal protection guarantee of Article 1, Paragraph 1 of the New Jersey Constitution, the State must provide to same-sex couples, on equal terms, the full rights and benefits enjoyed by heterosexual couples. The State can fulfill that constitutional requirement in one of two ways. It can either amend the marriage statutes to include same-sex couples or enact a parallel statutory structure by another name, in which same-sex couples would not only enjoy the rights and benefits, but also bear the burdens and obligations of civil marriage. If the State proceeds with a parallel scheme, it cannot make entry into same-sex civil union any more difficult than it is for heterosexual couples to enter the state of marriage. It may, however, regulate that scheme similarly to marriage and, for instance, restrict civil unions based on age and consanguinity and prohibit polygamous relationships.

The Court's ruling made clear that same-sex couples must be afforded the same rights and benefits enjoyed by opposite-sex couples in civil marriage under New Jersey law. Rather than mandate same-sex marriage, the Court deferred to the Legislature to decide whether to open the institution of civil marriage to same-sex couples or to devise a parallel statutory scheme that would provide the same rights and benefits to same-sex couples that were afforded to heterosexual couples in civil marriage. *Ibid.*

In response to the *Lewis* decision, the New Jersey Legislature enacted the Civil Union Act ("the Act"). That Act created a parallel system of civil unions for same-sex couples. By law, couples in civil unions are entitled to all of the rights, benefits, and

responsibilities of marriage. *See N.J.S.A.* 37:1–33. However, the Act denied same-sex couples the designation of "marriage" for their relationships. *N.J.S.A.* 37:1–28. As a part of the Act, the Legislature created the Civil Union Review Commission, which was charged with studying the effectiveness of civil unions for same-sex couples and to evaluate the Act's success. *See N.J.S.A.* 37:1–36.

On March 18, 2010, the *Lewis* plaintiffs filed a motion in aid of litigant's rights with the Supreme Court, asserting that the Civil Union Act failed to fulfill the Court's mandate and requesting that the Court compel the Legislature to open the institution of civil marriage to same-sex couples. In that motion, those plaintiffs relied upon the Civil Union Review Commission's final report, which had found that separate categorization in civil unions of same-sex couples invites and encourages unequal treatment. *See Lewis v. Harris,* 202 *N.J.* 340, 341, 997 *A.*2d 227 (2010) (hereinafter *"Lewis II"*). On July 26, 2010, the Court, in a 3–3 decision, denied plaintiffs' motion to enforce litigant's rights, without prejudice. The effect of the denial was to require the plaintiffs to file an action in the Superior Court for the development of a trial-like record. *Id.* at 341, 997 *A.*2d 227 ("The next step should be the development of a record on which those important issues can be resolved quickly.") (Long, J., dissenting).

## II. *Garden State Equality v. Dow.*

On June 29, 2011, plaintiffs in this case filed a four-count complaint with this court. Several of the couples were also plaintiffs in *Lewis,* although the litigants in the two cases are not identical. In the complaint, plaintiffs allege that New Jersey "shunts lesbian and gay couples into the novel and inferior status of 'civil union' while reserving civil marriage only for heterosexual couples." According to plaintiffs, the denial of access to the legal status of "marriage" causes plaintiffs concrete harms and results in the persistent and widespread lack of recognition of their rights in civic and commercial dealings. Much of the complaint details

the ways in which the various plaintiffs have been treated differently as partners in civil unions than they would have been treated if they were married spouses, and the complaint describes the various social, civic, and psychological harms they have experienced as a result. These are factual allegations that would likely require a trial-like record to prove. In addition, paragraph forty-five of the complaint specifically alleges that, "[r]elegating same-sex couples to civil unions hinders their ability to seek marriage-based benefits when Section 3 of the Defense of Marriage Act . . . is no longer operative." It is this paragraph, effectuated by the United States Supreme Court's invalidation of DOMA in *Windsor,* that is specifically at issue in this motion, which addresses whether, as a matter of law and not fact, the demise of DOMA requires the State to allow same-sex couples to marry.

In their complaint, plaintiffs assert four constitutional claims: count one asserts a denial of equal protection under Article I, Paragraph 1 of the New Jersey Constitution; count two asserts a denial of the fundamental right to marry under Article I, Paragraph 1 of the New Jersey Constitution; count three asserts a denial of equal protection under the Fourteenth Amendment to the United States Constitution, in violation of 42 *U.S.C.A.* § 1983; and count four asserts a denial of substantive due process under the Fourteenth Amendment to the United States Constitution, in violation of 42 *U.S.C.A.* § 1983. The relief sought under all counts is the same. Plaintiffs ask the court to require that defendants permit same-sex couples to marry in New Jersey.

On August 10, 2011, the State filed a motion to dismiss the complaint. The Honorable Linda R. Feinberg, A.J.S.C. (ret.), heard oral argument on November 4, 2011. On November 29, 2011, Judge Feinberg entered an order denying the State's motion to dismiss count one and granting the motion to dismiss counts two, three, and four. On December 19, 2011, plaintiffs filed a motion for reconsideration seeking to reinstate count three of the complaint, which was granted on March 7, 2012. Over the last year and a half, the parties have been in the midst of factual

discovery and have been preparing to proceed to expert discovery. Trial was anticipated to resolve factual disputes concerning the treatment of plaintiffs under the Civil Union Act.

### III. *United States v. Windsor.*

Meanwhile, on June 26, 2013, the United States Supreme Court invalidated Section 3 of the federal Defense of Marriage Act ("DOMA") in *Windsor, supra,* —— U.S. ——, 133 *S.Ct.* 2675, 186 *L.Ed.*2d 808. Section 3 had limited the definition of "marriage" in federal law to "a legal union between one man and one woman as husband and wife," and limited the word "spouse" in federal statutes to mean "a person of the opposite sex who is a husband or a wife." *See* 1 *U.S.C.A.* § 7; *Windsor, supra,* —— U.S. at ——, 133 *S.Ct.* at 2683, 186 *L.Ed.*2d at 816. In challenging DOMA, Edith Windsor asserted that she had married her now deceased spouse, Thea Spyer, in Canada. That marriage was recognized by the laws of their home State of New York, which also now allows same-sex marriage. Spyer died in February of 2009 and willed her estate to Windsor. Because DOMA did not permit federal recognition of marriages of same-sex couples, Windsor was denied a marital exemption to the federal estate tax, and was required to pay estate taxes in excess of $300,000. Windsor brought suit for a refund and challenged the constitutionality of DOMA. *Windsor, supra,* —— U.S. at ——, 133 *S.Ct.* at 2683–84, 186 *L.Ed.*2d at 816– 17. The Supreme Court found that section 3 of DOMA violated the due process and equal protection guarantees of the Fifth Amendment to the United States Constitution. The Court concluded that, "[t]he federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity." *Id.* at ——, 133 *S.Ct.* at 2696, 186 *L.Ed.*2d at 830. As a result, federal agencies were required to treat married same-sex couples in the same manner as they treat married opposite-sex couples in the administration of federal programs.

IV. Motion for Summary Judgment.

Plaintiffs brought this motion for summary judgment on July 3, 2013, arguing that the *Windsor* decision changed the legal landscape with respect to this case and requires New Jersey to afford same-sex couples the right to marry. First, plaintiffs argue that *Windsor* requires the federal government to provide equal marital benefits to same-sex and heterosexual couples whose marriages are recognized under state law. Because New Jersey does not allow same-sex couples to marry, plaintiffs argue, committed same-sex couples are not being "afforded on equal terms the same rights and benefits enjoyed by married opposite-sex couples" as required by *Lewis, supra,* 188 *N.J.* at 457, 908 *A.*2d 196. As such, plaintiffs argue that they are entitled to summary judgment as to count one of the complaint. They ask this court to compel the State to allow same-sex couples to enter into civil marriages in New Jersey.

In addition, plaintiffs argue that the federal constitutional analysis employed by the *Windsor* Court dictates that summary judgment be granted in favor of plaintiffs on count three of the complaint, which alleges a Fourteenth Amendment equal protection violation. Plaintiffs argue that New Jersey's Civil Union Act, like DOMA, relegates plaintiffs to second-tier relationships, with disadvantages and a stigma that attaches to this inferior status, resulting in a violation of the equal protection clause of the Fourteenth Amendment. Plaintiffs also argue that because of their inability to access federal benefits after the *Windsor* decision, the State's decision to create parallel marriage and civil union structures no longer has a rational basis.

The State argues that plaintiffs' motion is not ripe for adjudication because the extent to which civil union partners in New Jersey will have access to federal benefits is currently unknown. The State's substantive argument is that civil union partners in New Jersey are already entitled to federal benefits as a result of the *Windsor* decision. Thus, the State asserts that it has taken no action to violate *Lewis's* mandate and the New Jersey Constitu-

tion. Instead, the State's argument goes, the reason plaintiffs are injured is because of certain federal agencies' incorrect applications of *Windsor* that exclude civil union partners from benefits now enjoyed by same-sex married couples. The State also argues that there has been no "state action"—a key element in establishing an equal protection violation—and that even if there has been state action, New Jersey has a rational basis for the distinction between civil unions and marriages for same-sex couples. Finally, the State argues that the court should exercise caution before granting summary judgment, as this case has far-reaching consequences, involves significant policy considerations, and, at the very least, requires more factual discovery under *Lewis II*.

The court heard oral argument on the motion for summary judgment on August 15, 2013. On August 28, 2013, responding to the court's invitation at oral argument, plaintiffs submitted a supplemental brief in support of their motion. They argue first that more and more federal agencies are implementing *Windsor* by granting benefits and responsibilities to legally married same-sex couples, while limiting the extension of benefits to only those couples and excluding civil union couples. In response to arguments concerning Garden State Equality's lack of standing due to the absence of a concrete injury, plaintiffs also provided affidavits from four Garden State Equality members. Two of the affidavits were signed by federal employees with civil union partners who claim to be harmed by the decision of the Office of Personnel Management to exclude civil union partners from employee benefits, and the other two were signed by civil union partners in same-sex relationships with noncitizens, who claim to be harmed by the recent decision of the United States Department of State not to allow them to sponsor their civil union partners for immigration purposes. Plaintiffs further argue that it is appropriate for this court to decide the issues before it, and that the court would not be acting prematurely in entertaining plaintiffs' claims.

The State also submitted a supplemental brief on August 28, 2013, reiterating its opposition to the motion for summary judg-

ment. It first argues in favor of deferring action to a later date, as there are several bills that have been proposed in Congress to extend federal benefits to couples in civil unions. The State's supplemental brief also argues that principles of federalism and separation of powers preclude this court from granting the remedy requested by plaintiffs. And the State argues that material facts concerning how federal agencies will determine the application of benefits after *Windsor* remain unknown, and that therefore ripeness and standing concerns should prevent the court from ruling at this time. Both sides have filed additional letters with the court regarding new post-*Windsor* pronouncements from federal agencies and the recent introduction of bills in Congress requiring federal agencies to treat civil union couples in the same manner as same-sex married couples.

V. Participation by Amicus.

On July 11, 2013, a group of civil rights organizations filed a motion for leave to appear as amicus curiae, including with their motion a proposed brief supporting plaintiffs' motion for summary judgment. Those organizations include the American Civil Liberties Union of New Jersey, the American–Arab Anti–Discrimination Committee, the Asian American Legal Defense and Education Fund, the Garden State Bar Association, the Hispanic Bar Association of New Jersey, Legal Momentum, and the National Organization for Women of New Jersey (collectively "amici"). On July 19, 2013, the State informed the court that it would not be opposing the filing of the amicus motion, and the State filed a reply to the amicus brief on August 9, 2013.

In their brief, amici argue that New Jersey courts have, in the past, recognized their authority and responsibility to correct legislative action that fails to comply with a previously articulated constitutional mandate. *See, e.g., Abbott v. Burke,* 149 *N.J.* 145, 693 *A.2d* 417 (1997); *Oakwood v. Twp. of Madison,* 72 *N.J.* 481, 371 *A.2d* 1192 (1977); *Robinson v. Cahill,* 69 *N.J.* 133, 351 *A.2d* 713 (1975). Amici further point to several cases in which courts

have monitored the success of legislative actions to provide functional equality through the use of parallel systems, and discarded those structures in favor of a unitary system when it was demonstrated that those parallel structures did not compare to the dominant system. For example, amici point to the Virginia Military Institute (VMI) case, in which the Fourth Circuit had initially found that single-gender education at VMI could be justified by its institutional mission, and allowed VMI to create a separate school for women. *United States v. Virginia*, 44 *F.*3d 1229 (4th Cir. 1995), *rev'd*, 518 *U.S.* 515, 116 *S.Ct.* 2264, 135 *L.Ed.*2d 735 (1996). The United States Supreme Court subsequently found that scheme unconstitutional, because the women's school was not the equal of VMI. *United States v. Virginia*, 518 *U.S.* 515, 555–56, 116 *S.Ct.* 2264, 2286–87, 135 *L.Ed.*2d 735, 765 (1996). Amici also argue that the Legislature has not adequately explained why it chose to create a separate statutory structure for same-sex couples, and that mere reliance on the existence of a history of exclusion of an affected minority group cannot provide a valid reason for continuing that exclusion.

VI. The Federal Response to *Windsor*.

DOMA had restricted the federal government from recognizing legal same-sex marriages authorized by state law, so its invalidation by the United States Supreme Court has caused federal agencies to re-evaluate the extent to which same-sex couples are eligible for federal benefits. The key choice presented to these agencies has been whether to extend benefits to all legal same-sex unions recognized by the states, or only to extend benefits to same-sex couples that are legally married.

Since *Windsor*, the clear trend has been for agencies to limit the extension of benefits to only those same-sex couples in legally recognized marriages. For example, the Office of Personnel Management has noted that it does not intend to extend coverage for health benefits to civil union partners of civilian federal employees. *See* Federal Employee Health Benefit Program Car-

rier Letter No.2013–20, from John O'Brien, Director of Healthcare and Insurance, OPM to All Carriers (July 3, 2013), *available at* http://www.opm.gov/healthcare–insurance/healthcare/carriers/2013/2013–20.pdf. In addition, the State Department will only recognize actual marriages when determining spousal eligibility for immigration purposes. *See* U.S. Dep't of State, "U.S. Visas for Same–Sex Spouses: FAQs for Post–Defense of Marriage Act," http://travel.state.gov/visa/frvi/frvi_6036.html (last visited Sept. 27, 2013) ("At this time, only a relationship legally considered to be a marriage in the jurisdiction where it took place establishes eligibility as a spouse for immigration purposes."). And the Federal Election Commission ("FEC") has decided that, for the purposes of campaign finance law, "same-sex couples married under State law are 'spouses' for the purpose of [FEC] regulations." FEC Advisory Opinion 2013–06, at 3 (July 25, 2013).

Following the briefing in this matter but prior to oral argument, two more federal agencies, the Department of Defense and the Wage and Hour Division of the Department of Labor, stated that they would extend benefits only to legally married same-sex couples. *See* Press Release, American Forces Press Service, DOD Announces Same–Sex Spouse Benefits, (Aug. 14, 2013), *available at* http://www.defense.gov/news/newsarticle.aspx?id=120621 ("[I]n consultation with the Department of Justice and other executive branch agencies, the Defense Department will make spousal and family benefits available ... regardless of sexual orientation, as long as service member-sponsors provide a valid marriage certificate."); Wage and Hour Division, U.S. Department of Labor, "Fact Sheet # 28F: Qualifying Reasons for Leave under the Family and Medical Leave Act" (2013) (defining spouse for the purposes of the FMLA as "a husband or wife as defined or recognized under state law for purposes of marriage in the state where the employee resides, including 'common law' marriage and same-sex marriage.").

After oral argument, several more agencies followed suit. The Office of Government Ethics (OGE) issued a Legal Advisory on

August 19, 2013, putting federal employees on notice that the ethics statutes that apply to federal employees will now apply to same-sex spouses and same-sex marriages. *See* "United States Office of Government Ethics Memorandum LA–13–10: Effect of the Supreme Court's Decision in *United States v. Windsor* on the Executive Branch Ethics Program" (Aug. 19, 2013), *available at* http://www.oge.gov/OGE–Advisories/Legal–Advisories/LA–13–10– Effect–of–the–Supreme–Court–s–Decision–in–United–States–v– Windsor–on–the–Executive–Branch–Ethics–Program/. That directive specifically noted that, "[t]he terms 'marriage,' 'spouse,' and 'relative' as used in the federal ethics provisions will continue to be interpreted not to include a federal employee in a civil union, domestic partnership, or other legally recognized relationship other than a marriage," and that the OGE had specifically consulted with the United States Department of Justice in writing the Legal Advisory. *Id.* at 2.

On August 29, 2013, the Internal Revenue Service (IRS) issued a ruling confirming that same-sex married couples will be treated the same as opposite-sex married couples for federal tax purposes, but that civil union couples will be treated differently:

> There are more than two hundred Code provisions and Treasury regulations relating to the internal revenue laws that include the terms "spouse," "marriage" (and derivatives thereof, such as "marries" and "married"), "husband and wife," "husband," and "wife." . . . For Federal tax purposes, the term "marriage" does not include registered domestic partnerships, civil unions, or other similar formal relationships recognized under state law that are not denominated as a marriage under that state's law.
>
> [Rev. Rul.2013–17, at 4, 12].

On the same day, the Centers for Medicare & Medicaid Services (CMS) reached the same conclusion. CMS issued a memorandum directing Medicare Advantage organizations to cover services in skilled nursing facilities for "validly married" same-sex spouses, to the same extent that services would be required for opposite-sex spouses. Memorandum from Danielle R. Moon, Director of CMS, "Impact of *United States v. Windsor* on Skilled Nursing Facility Benefits for Medicare Advantage Enrollees," August 29, 2013, *available at* http://www.cms.gov/Medicare/HealthPlans/Health

PlansGenInfo/Downloads/SNF_Benefits_Post_Windsor.pdf. CMS determined that the term "spouse" only "includes individuals of the same sex who are lawfully married under the law of a state, territory, or foreign jurisdiction." [3]

And on September 18, 2013, the Department of Labor issued new guidelines concerning the agency's definitions of "spouse" and "marriage" for the purposes of the Earned Retirement Income Security Act of 1974 ("ERISA"), 29 *U.S.C.A.* § 1001 to –1461. *See* U.S. Department of Labor, "Guidance to Employee Benefit Plans on the Definition of 'Spouse' and 'Marriage' under ERISA and the Supreme Court's Decision in *United States v. Windsor*," http://www.dol.gov/ebsa/newsroom/tr13–04.html (Sept. 18, 2013). The guidance specifically states that the terms "do not include individuals in a formal relationship recognized by a state that is not denominated a marriage under state law, such as a domestic partnership or civil union." *Ibid.* This guidance has a broad scope, because most private sector employee benefits plans are governed by ERISA. *See* U.S. Department of Labor, "Health Benefits, Retirement Standards, and Workers' Compensation: Employee Benefit Plans," http://www.dol.gov/compliance/guide/erisa.htm (last visited Sept. 20, 2013).

To be sure, though the trend seems to be in favor of extending benefits only to legally married same-sex couples, many agencies have not yet announced definitive plans for how to implement the *Windsor* decision. And the Department of Defense (DoD), despite its earlier confirmation in a press release that benefits would be available to validly married same-sex couples, has since suggested that in the future, benefits may be extended to same-sex

---

[3] The IRS and CMS rulings leave open the possibility that a New Jersey couple could marry in a state that allows same-sex marriages, and then return to New Jersey and be eligible for federal benefits. This is known as the "place of celebration" rule. Rev. Rul.2013–17, at 9; CMS Memorandum, at 2. However, other federal agencies have not adopted this rule, and instead base benefits decisions on the laws of the couple's current domicile. *See, e.g.,* 38 *U.S.C.* § 103(c) (veterans' benefits); 17 *U.S.C.* § 101 (copyrights); 29 *C.F.R.* § 825.122 (FMLA).

civil union couples as well. *See* Proposed Collection; Comment Request, 78 *Fed.Reg.* 54,633 (Sept. 5, 2013) (DoD suggesting that it needs to collect information on same-sex domestic partnerships because "[b]enefits shall be extended to same-sex domestic partners ... once the DoD civilian and his/her same-sex domestic partner have signed a declaration attesting to the existence of their committed relationship"); *see also* Vet Center Services, 78 *Fed.Reg.* 57,067 (Sept. 17, 2013) (to be codified at 38 *C.F.R.* pt. 17) (definition of "family member" for purposes of counseling services at Vet Centers "would encompass domestic partners, spouses, children, and parents").

Finally, several pieces of legislation have been proposed in the United States House of Representatives aimed at requiring federal agencies to extend benefits to same-sex civil union couples as well as to same-sex married couples. *Federal Benefits Equality Act,* H.R. 2834, 113th Cong., 1st Sess. (2013); H.R. 3050, 113th Cong. (1st Sess.2013); *Act to Provide Certain Benefits to Domestic Partners of Federal Employees, H.R.* 3135, 113th Cong. (2013); Press Release, Senator Tammy Baldwin, U.S. Senators Tammy Baldwin and Susan Collins Introduce Bipartisan Legislation to Provide Fairness to Domestic Partners (Sept. 19, 2013), *available at* http://www.baldwin.senate.gov/press-releases/us-senators-tammy-baldwin-and-susan-collins-introduce-bipartisan-legislation-to-provide-fairness-to-domestic-partners.[4]

## STANDARD OF REVIEW

### I. Summary Judgment.

If a court finds that "one party must prevail as a matter of law," the court "should not hesitate to grant summary judgment." *Brill*

---

[4] This court, though unable to predict the likelihood that pending or proposed legislation will eventually become law, notes that the press release announcing the bill sponsored by Senator Baldwin states that she first co–sponsored the bill in the House of Representatives in 1999, and had worked on the bill between 2007 and 2012, without its passing.

v. *Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.2d* 146 (1995). Unlike most motions for summary judgment, this motion is akin to a facial challenge of New Jersey's refusal to extend marriage to same-sex couples and does not require a determination of whether there is a genuine issue of material fact. Plaintiffs contend that New Jersey's exclusion of same-sex couples from civil marriage deprives same-sex couples in New Jersey of federal rights accorded to same-sex married couples, and thus violates the Constitutions of New Jersey and the United States. As such, plaintiffs ask this court to rule on a legal issue that they claim can be decided without a hearing to resolve disputed facts. Moreover, the State has raised legal issues regarding jurisdiction and justiciability and requests rulings on these issues without a trial-type hearing.

## II. Exercise of Caution.

■ This court must tread lightly when deciding whether to invalidate a statutory scheme involving far-reaching consequences and policy considerations. When "issues with farreaching [sic] effects are involved, a Court should exercise caution in granting summary judgment." *See Millison v. E.I. du Pont de Nemours & Co.*, 101 *N.J.* 161, 199, 501 *A.2d* 505 (1985) (Handler, J. dissenting) (citing *Jackson v. Muhlenberg Hosp.*, 53 *N.J.* 138, 249 *A.2d* 65 (1969)). *Jackson*, 53 *N.J.* 138, 249 *A.2d* 65, was a personal injury lawsuit in which the trial court had granted partial summary judgment on a very meager factual record. The Court reversed the grant of summary judgment and remanded for trial, noting that the ruling "would reach far beyond the particular case." *Id.* at 142, 249 *A.2d* 65 (citation omitted). The State further cites to several other cases remanded to the trial court by the Appellate Division for further factual development where the issues involved significant and/or novel policy considerations. *See Edwards v. McBreen*, 369 *N.J.Super.* 415, 849 *A.2d* 204 (App.Div.2004); *Lusardi v. Curtis Point Property Owners Ass'n*, 138 *N.J.Super.* 44, 350 *A.2d* 242 (App.Div.1975); *Bennett v. T & F Distributing Co.*, 117 *N.J.Super.* 439, 285 *A.2d* 59 (App.Div.1971), *certif. denied*, 60

*N.J.* 350, 289 *A.*2d 795 (1972). This court is mindful of the significant social and political background of this case. As noted in *Lewis,* this court's role is necessarily limited to constitutional adjudication, rather than entering the "swift and treacherous currents of social policy." *Lewis, supra,* 188 *N.J.* at 460, 908 *A.*2d 196.

Moreover, courts shall not "declare void legislation unless its repugnancy to the Constitution is clear beyond a reasonable doubt." *In re Matter of P.L. 2001,* 186 *N.J.* 368, 392, 895 *A.*2d 1128 (2006) (internal citations omitted). The burden falls on the party challenging the legislation "to demonstrate clearly that it violates a constitutional provision." *Lewis, supra,* 188 *N.J.* at 459, 908 *A.*2d 196 (citing *Caviglia v. Royal Tours of Am.,* 178 *N.J.* 460, 477, 842 *A.*2d 125 (2004)). The Legislature has broad discretion in determining the "perimeters of a classification." *Brown v. N.J. Dep't of Treasury,* 356 *N.J.Super.* 71, 80, 811 *A.*2d 501 (App.Div.2002) (citing *Harvey v. Essex Cnty. Bd. of Freeholders,* 30 *N.J.* 381, 390, 153 *A.*2d 10 (1959)). It is not the court's task to weigh the "efficacy or wisdom" of the challenged legislation. *Ibid.* (citing *State Farm Mut. Auto. Ins. Co. v. State,* 124 *N.J.* 32, 45, 590 *A.*2d 191 (1991)). In order to prevail on their motion for summary judgment, plaintiffs must show that New Jersey's failure to provide same-sex couples with the label of civil marriage, "unmistakably … run[s] afoul of the Constitution." *Lewis, supra,* 188 *N.J.* at 459, 908 *A.*2d 196 (refusing to hold that "identical schemes called by different names would create a distinction that would offend Article I, Paragraph 1," because the court "will not presume that a difference in name alone is of constitutional magnitude").

## *ANALYSIS*

I. Plaintiffs' Claims Are Ripe for Review by This Court.

The United States Supreme Court's decision in *Windsor* officially went into effect on July 21, 2013. In addition, on June 26, 2013,

the day of the *Windsor* decision, President Obama directed the Attorney General to work with other Cabinet members to "review all relevant federal statutes to ensure this decision, including its implications for Federal benefits and obligations, is implemented swiftly and smoothly." Press Release, Office of the White House Press Secretary, Statement by the President on. the Supreme Court Ruling on the Defense of Marriage Act (June 26, 2013), *available at* http://www.whitehouse.gov/doma-statement. Despite this directive, it is possible that some federal agencies may take a considerable amount of time to change forms, implement procedures, train personnel, and incorporate same-sex couples into their administrative programs. Policy and regulation changes may also be necessary to accommodate the *Windsor* ruling—a process that could take months or years. Because of this circumstance, the State argues that there is not yet a clear position from the federal government as to whether federal benefits will be extended to civil union couples. As a result, the State argues that this motion is not yet ripe for decision by the court and must be denied.

Ripeness is a justiciability doctrine designed to avoid premature adjudication of abstract disagreements. *Abbott Labs. v. Gardner*, 387 *U.S.* 136, 148–49, 87 *S.Ct.* 1507, 1515, 18 *L.Ed.*2d 681, 691 (1967). Courts should not interfere with an agency's administrative decision until the decision has been implemented and its effects felt in a concrete way by the challenging parties. *Ibid.; see also 966 Video, Inc. v. Mayor & Twp. Comm. of Hazlet Twp.*, 299 *N.J.Super.* 501, 515–16, 691 *A.2d* 435 (Law Div.1995). Unlike in federal courts, in New Jersey, "any concern about passing judgment on an abstract injury is tempered by the fact that [New Jersey courts] [are] not limited to the case or controversy requirement imposed on the federal courts by way of Article III of the Federal Constitution." *Comm. to Recall Robert Menendez from the Office of U.S. Senate v. Wells*, 204 *N.J.* 79, 102, 7 *A.3d* 720 (2010) (citing *In re Application of Boardwalk Regency Corp. for Casino License*, 90 *N.J.* 361, 367, 447 *A.2d* 1335, *appeal dismissed*, 459 *U.S.* 1081, 103 *S.Ct.* 562, 74 *L.Ed.*2d 927 (1982)).

New Jersey state courts thus have more freedom to decide cases than their federal counterparts, which are limited by constitutionally based ripeness principles.

To determine if a case is ripe for judicial review, the court must evaluate: 1) the fitness of the issues for judicial decision, and 2) the hardship to the parties caused by withholding court consideration. *K. Hovnanian Co. of N. Central Jersey, Inc. v. N.J. Dep't of Envtl. Prot.*, 379 *N.J.Super.* 1, 9, 876 *A.*2d 847 (App.Div.), *certif. denied*, 185 *N.J.* 390, 886 *A.*2d 661 (2005). As to whether an issue is fit for judicial review, courts must first determine "whether review would require additional factual development." *Id.* at 10, 876 *A.*2d 847. A case is fit for review if the "issues in dispute are purely legal, and thus, appropriate for judicial resolution without developing additional facts." *Comm. To Recall Robert Menendez, supra*, 204 *N.J.* at 99, 7 *A.*3d 720. A declaratory judgment claim is not ripe for adjudication if the facts illustrate that the rights or status of the parties are "future, contingent, and uncertain." *Indep. Realty Co. v. Twp. of N. Bergen*, 376 *N.J.Super.* 295, 302, 870 *A.*2d 637 (App.Div.2005). With respect to the "hardship" prong of the ripeness analysis, courts can assume jurisdiction over a claim only if there is a "real and immediate" threat of enforcement or harm that would affect the plaintiff. *K. Hovnanian Co., supra*, 379 *N.J.Super.* at 10, 876 *A.*2d 847 (citing *966 Video, Inc., supra*, 299 *N.J.Super.* at 515–16, 691 *A.*2d 435).

The State, relying on federal ripeness decisions, argues that this motion is not yet fit for judicial decision, as many of the federal administrative pronouncements applying the *Windsor* decision are not final and have not "sufficiently crystallized." *See Lake Pilots Ass'n, Inc. v. U.S. Coast Guard*, 257 *F.Supp.*2d 148, 160 (D.D.C. 2003), *appeal dismissed*, 359 *F.*3d 624 (D.C.Cir.2004) (citation omitted). The State also argues that plaintiffs cannot show that withholding court consideration will cause a serious enough hardship to merit court review. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 *U.S.* 803, 808, 123 *S.Ct.* 2026, 2030, 155

*L.Ed.*2d 1017, 1024–25 (2003); *Am. Petroleum Inst. v. Envtl. Prot. Agency,* 683 *F.*3d 382 (D.C.Cir.2012); *Colwell v. Dep't of Health & Human Servs.,* 558 *F.*3d 1112 (9th Cir.2009). Lastly, the State argues that ripeness is of particular concern here because this case involves the constitutionality of New Jersey's statutory civil marriage and civil union scheme. *See In re Ass'n of Trial Lawyers of Am.,* 228 *N.J.Super.* 180, 184, 549 *A.*2d 446 (App.Div.) ("Deeply embedded in our jurisprudence is the settled principle against resolving disputes in advance of constitutional necessity."), *certif. denied,* 113 *N.J.* 660, 552 *A.*2d 180 (1988).

The State points to several federal cases finding a lack of ripeness in the context of agency action. In *National Park Hospitality Association, supra,* 538 *U.S.* at 810, 123 *S.Ct.* at 2031, 155 *L.Ed.*2d at 1026, the Court held that a perceived conflict between a regulation issued by the National Park Service and the Contract Disputes Act of 1978 was not ripe for review without a true conflict as applied to concession contracts with the National Park Service. ("[C]oncessioners suffer no practical harm as a result of [the regulation]. All the regulation does is announce the position NPS will take with respect to disputes arising out of concession contracts."). *Ibid.* Similarly, in a recent D.C. Circuit case, *American Petroleum, supra,* 683 *F.*3d at 384, the EPA issued a notice of proposed rulemaking prior to oral argument that would have significantly amended the challenged rule. The court held that because postponing review could conserve judicial resources, the matter was no longer ripe. *Id.* at 386. The court further held that "declining jurisdiction over a dispute while there is still time for the challenging party to 'convince the agency to alter a tentative position' provides the agency 'an opportunity to correct its own mistakes and to apply its expertise,' potentially eliminating the need for (and costs of) judicial review," and further would avoid "inefficient and unnecessary 'piecemeal review.'" *Id.* at 387 (quoting *Pub. Citizen Health Research Group v. FDA,* 740 *F.*2d 21, 30–31 (D.C.Cir.1984)).

The State relies on these and other cases to argue that this motion is unripe and cannot be considered until all agency actions

concerning how *Windsor* will be applied are sufficiently final. *See Texas v. United States,* 523 *U.S.* 296, 300, 118 *S.Ct.* 1257, 1259–60, 140 *L.Ed.*2d 406, 410–11 (1998) (affirming district court's dismissal of claim that challenged Attorney General's finding that certain sanctions under Texas Educational Code would require pre-clearance under Section 5 of the Voting Rights Act as unripe); *Colwell, supra,* 558 *F.*3d at 1129 (refusing on grounds of prudential ripeness to hear plaintiffs' claims "without knowing the manner in which HHS will apply" its policy); *K. Hovnanian Co., supra,* 379 *N.J.Super.* at 9, 876 *A.*2d 847 (dismissing case as unripe where land use matter was not fully resolved at administrative agency level); *Indep. Realty Co., supra,* 376 *N.J.Super.* at 302, 870 *A.*2d 637 (holding that court could not enter a declaratory judgment as to applicability of zoning regulations where owner had not yet applied for permits and variances needed to build, as the facts were "future, contingent, and uncertain").

Whether this motion is fit for review depends in some ways on how the issue is framed and how that framing affects the remedy available to plaintiffs. Both plaintiffs and the State agree that post-*Windsor* and pursuant to the *Lewis* decision, same-sex couples in New Jersey should be entitled to the full spectrum of federal benefits and responsibilities provided to married couples. Given that, there are at least two potential remedies. The first is the remedy plaintiffs urge: for the State of New Jersey to allow same-sex couples to get married. The second is the remedy the State presents as the core of its opposition: that the federal agencies must recognize that New Jersey civil unions are equivalent to marriage and therefore provide the same spectrum of benefits to New Jersey same-sex couples in civil unions that they must provide, post-*Windsor*, to same-sex married couples. For the State, it is only if that remedy becomes unavailable for plaintiffs that the issues presented in this motion would become ripe for review.[5]

---

[5] The State's ripeness argument does not apply to plaintiffs' federal claims. Indeed, plaintiffs' federal equal protection claim does not necessarily turn on

The court is persuaded that plaintiffs' claims are ripe for adjudication. First, plaintiffs' claims are fit for judicial review because, at least in relation to their New Jersey constitutional claim, they present legal questions that require no further factual development. By the terms of the Civil Union Act, same-sex partners in New Jersey are not each other's spouses, and are not married; rather, they are partners in a civil union. As discussed above, though many federal agencies have not yet announced definitive plans for how to implement the *Windsor* decision, several agencies have already determined how they will implement the change in law effectuated by *Windsor*. The Office of Personnel Management, the State Department, Internal Revenue Service, Department of Labor, and the Centers for Medicare and Medicaid have all determined that benefits will be offered only to legally married same-sex couples, and not to civil union couples. As a result, plaintiffs are *currently* ineligible for benefits as a result of rules and policies already in place. Thus, this case is distinguishable from *American Petroleum, supra,* 683 *F.*3d at 387, where the plaintiffs challenged a proposed rule before it was enacted. The issue of whether the State must act to change its statutory structure for civil unions and marriages is purely a legal one that depends upon the interaction of the *Windsor* decision with the mandates established by the New Jersey Supreme Court in *Lewis*.

To be sure, many federal agencies have not yet announced how they will apply *Windsor* and whether they will provide New Jersey couples in civil unions with federal marriage benefits. Perhaps some will. *See, e.g.,* Proposed Collection; Comment Request, *supra,* 78 *Fed.Reg.* 54,633; Vet Center Services, *supra,*

---

whether the federal government will provide same-sex couples benefits. Rather, plaintiffs pose a rather simple question: whether New Jersey's parallel structures of civil unions for same-sex couples and marriage for opposite-sex couples have a rational basis; that is, are they rationally related to a legitimate government interest? The State does not make any specific ripeness arguments as to why plaintiffs' federal claim is unripe, other than to point to the need for more factual development.

78 *Fed.Reg.* 57,067. But the fact that federal agency implementation of *Windsor* is in flux does not mean that this court must defer its decision. At least six federal agencies have explicitly stated that they will provide marriage benefits only to legally married same-sex couples. Consequently, regardless of future fluctuations in the law, plaintiffs are today not eligible for benefits as a result of their "civil union" status mandated by New Jersey law. In particular, the Department of Labor pronounced that the provisions of the Family and Medical Leave Act (FMLA), 29 *U.S.C.* §§ 2601 to 2654, will apply only to spouses in same-sex marriages.[6] Therefore, if any of the plaintiffs got sick prior to a change in this policy, their partner's employer could refuse to allow the civil union partner to take leave to care for the ill partner under the FMLA. Certainly, the existence of this quandary for plaintiffs is real and requires no further factual development.

Moreover, the conclusion that plaintiffs have presented a legal question fit for review is bolstered by the overall uncertainty created by piecemeal pronouncements from various federal agencies and the potential for a lack of uniformity as to eligibility for marital benefits. Such uncertainty itself has concrete effects on plaintiffs in terms of current decision-making and planning for future eventualities. In essence, plaintiffs' federal benefits are subject to benefit-by-benefit regulation by whatever federal agency is in charge of administering the benefit program. This legal predicament was created by the *Windsor* decision and requires no further factual consideration. As such, the court's adjudication of the motion would not benefit from "further factual development of the issues presented," and is fit for review now. *Ohio Forestry Ass'n v. Sierra Club,* 523 *U.S.* 726, 733, 118 *S.Ct.* 1665, 1670, 140 *L.Ed.*2d 921, 929 (1998).

---

[6] The FMLA covers "eligible employees," which includes all employees, except for those employed either by certain federal agencies or by businesses with fewer than fifty employees within seventy-five miles of a worksite. 29 *U.S.C.* § 2611.

The State has notified the court of proposed legislation that would extend federal marital benefits to civil union couples, and argues that review should be denied in this case because the proposed legislation is proof that the law is "in flux." *See, e.g., Fed. Benefits Equality Act,* H.R. 2834, 113th Cong., 1st Sess. (2013). However, to accept the State's argument would render every constitutional challenge to any law untenable; the defendants would simply deflect any challenges by asserting that the challenged law may be remedied through legislation at some point in the future. Such a position would be fatal to any enforcement of constitutional protections through the judicial system and cannot be countenanced. *Cf. Bartlett v. Bowen,* 816 *F.*2d 695, 707 (D.C.Cir.1987) ("The delicate balance implicit in the doctrine of separation of powers would be destroyed if Congress were allowed not only to legislate, but also to judge the constitutionality of its own actions."). For an example of this principle, see *In re Conroy,* 98 *N.J.* 321, 344 n. 2, 486 *A.*2d 1209 (1985), in which the New Jersey Supreme Court resolved difficult issues concerning the termination of life support and the constitutional right to refuse medical treatment, even though there were legislative attempts to address those issues pending in the Legislature at the time. Thus, the existence of pending legislation that may address plaintiffs' concerns does not require postponement of judicial review.

Plaintiffs have also satisfied the "hardship" prong of the test for ripeness. As couples in civil unions, plaintiffs are currently ineligible for at least some of the federal marital rights and benefits that married opposite-sex couples possess. If, as plaintiffs claim, this impact constitutes a violation of the New Jersey Constitution, then their current circumstances result in an "immediate and significant" hardship affecting their constitutional rights. *See, e.g., Elrod v. Burns,* 427 *U.S.* 347, 373, 96 *S.Ct.* 2673, 2690, 49 *L.Ed.*2d 547, 565 (1976) (holding that the loss of First Amendment freedoms, even for a short period of time, "unquestionably constitutes irreparable injury."); *Davis v. N.J. Dep't of Law & Pub. Safety, Div. of State Police,* 327 *N.J.Super.* 59, 69, 742 *A.*2d 619

(Law Div.1999) (quoting *Elrod, supra,* 427 *U.S.* at 373, 96 *S.Ct.* at 2690, 49 *L.Ed.*2d at 565). *See also Home Builders League of S. Jersey, Inc. v. Evesham,* 174 *N.J.Super.* 252, 257, 416 *A.*2d 81 (Law Div.1980) (where plaintiffs raised constitutional challenge to ordinances and court had to decide whether to expand time for review "in the interests of justice," court assumed jurisdiction, explaining that, "[n]ot only is there a substantial constitutional question alleged ... but, as time goes on, if no restraint of the ordinance requirements is imposed, it could cause continuing harm to plaintiffs and others similarly situated.") Similarly, in this case, if the denial of marriage to same-sex couples now violates the New Jersey Constitution—as plaintiffs contend—then every day the plaintiffs' claims evade judicial review, continuing harm is caused to them.

Moreover, it is uncertain when, if not now, plaintiffs' claims could be ripe for review. As the *Windsor* Court noted, DOMA had affected approximately 1,000 federal statutes and regulations. *Windsor, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 2683, 186 *L.Ed.*2d at 816. It is unknown when each of the federal agencies charged with implementing those laws and rules will decide the manner in which they will comply with *Windsor,* and every day that the undecided federal agencies delay their decision, plaintiffs will remain uncertain as to whether their status renders them ineligible for certain federal benefits. In addition, while waiting for agencies to clarify their positions regarding civil union couples, plaintiffs will remain ineligible for marital benefits from the federal agencies that have already decided to exclude them from coverage. And there is no judicially manageable standard to determine when exactly "enough" agencies have implemented *Windsor* to justify judicial review. Leaving review for some indeterminate time when *all* federal agencies have acted would constitute a clear hardship for plaintiffs if, as they claim, their current inability to obtain federal marital benefits amounts to a deprivation of constitutional magnitude. *See Elrod, supra,* 427 *U.S.* at 373, 96 *S.Ct.* at 2690, 49 *L.Ed.*2d at 565.

As the New Jersey Supreme Court recently confirmed, "this Court is 'not limited to the "case or controversy" requirement imposed on the federal courts by way of Article III of the Federal Constitution.'" *Comm. to Recall Robert Menendez, supra,* 204 *N.J.* at 102–03, 7 *A.*3d 720 (quoting *In re Application of Boardwalk Regency Corp., supra,* 90 *N.J.* at 367, 447 *A.*2d 1335); *see also In re Ass'n of Trial Lawyers of Am., supra,* 228 *N.J.Super.* at 184, 549 *A.*2d 446 (New Jersey courts have "taken a much more liberal approach on the issues of . . . justiciability than have the federal cases."). In *Committee To Recall Robert Menendez, supra,* 204 *N.J.* at 103, 7 *A.*3d 720 the Court found that review was favored because the constitutionality of the challenged law was an issue of "major public importance" (quoting *City of Atl. City v. Laezza,* 80 *N.J.* 255, 266, 403 *A.*2d 465 (1979)). It can hardly be questioned that the case before this court also presents an issue of major public importance. Plaintiffs' challenge to their exclusion from civil marriage raises significant constitutional questions that affect the individual rights of thousands of people in New Jersey.

The *Lewis* Court was clear in its mandate that "our State Constitution guarantees that every statutory right and benefit conferred to heterosexual couples through civil marriage must be made available to committed same-sex couples." *Lewis, supra,* 188 *N.J.* at 462, 908 *A.*2d 196. Whether, under *Lewis,* the change in federal law brought about by *Windsor* requires the State of New Jersey to allow same-sex couples to marry is a question that is now fit for review by this court.

## II. Plaintiffs Have Standing to Bring This Action.

The State has also questioned, briefly in their opposition and again at oral argument, whether any of the plaintiffs have standing to bring this motion, as none of them have been directly denied a federal benefit, nor are they federal employees, members of the military, or persons applying for entry into the United States.

The concept of standing refers to a party's entitlement to maintain an action before the court. *In re Adoption of Baby T.*, 160 *N.J.* 332, 340, 734 *A*.2d 304 (1999); *N.J. Citizen Action v. Riviera Motel Corp.*, 296 *N.J.Super.* 402, 409, 686 *A*.2d 1265 (App.Div.1997), *appeal dismissed as moot*, 152 *N.J.* 361, 704 *A*.2d 1297 (1998). In order to demonstrate standing, a plaintiff must have a "sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and there must be a substantial likelihood that the plaintiff will suffer harm in the event of an unfavorable decision." *N.J. Citizen Action, supra,* 296 *N.J.Super.* at 409–10, 686 *A*.2d 1265 (citing *N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n,* 82 *N.J.* 57, 67, 411 *A*.2d 168 (1980)). New Jersey courts take a broad and liberal approach to the issue of standing. *N.J. Citizen Action, supra,* 296 *N.J.Super.* at 415, 686 *A*.2d 1265.

Applying these principles to associations, courts have concluded that "an association has standing to sue as the sole party plaintiff when it has a real stake in the outcome of the litigation, there is a real adverseness in the proceeding, and the complaint 'is confined strictly to matters of common interest and does not include any individual grievance which might perhaps be dealt with more appropriately in a proceeding between the individual [member] and the [defendant].'" *N.J. Citizen Action, supra,* 296 *N.J.Super.* at 416, 686 *A*.2d 1265 (quoting *Crescent Pk. Tenants Ass'n v. Realty Equities Corp.*, 58 *N.J.* 98, 109, 275 *A*.2d 433 (1971)). Moreover, if an individual plaintiff has standing, the organizational plaintiff of which the individual is a member also has standing. *People For Open Gov't v. Roberts,* 397 *N.J.Super.* 502, 515, 938 *A*.2d 158 (App.Div.2008).

The court is satisfied that plaintiffs have standing to proceed with this action. As the arguments of the parties demonstrate, there is a real adverseness as to the subject matter in dispute. Plaintiffs also have demonstrated a sufficient stake in the outcome of this motion in terms of their seeking eligibility for federal benefits. Moreover, plaintiffs' interests are not overly

general. Rather, both the individual plaintiffs and the membership of Garden State Equality are claiming a clear and present harm that will continue indefinitely into the future. As discussed above in the context of ripeness, plaintiffs are currently not eligible to receive certain federal benefits as a result of New Jersey's marriage and civil union structure. In addition, Garden State Equality has provided the court with affidavits from four of its members attesting that they are currently harmed by their inability to obtain federal benefits. These affidavits remove all doubt as to the standing of Garden State Equality. As a result of these considerations, and given New Jersey's policy of liberal standing requirements, the court is satisfied that both the named individual plaintiffs and Garden State Equality have sufficient standing to bring this action.

Discussing justiciability, the New Jersey Supreme Court recently reiterated that:

> Our "liberal rules of standing" are animated by a venerated principle: "In the overall we have given due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of just and expeditious determinations on the ultimate merits." And that principle is premised on a core concept of New Jersey jurisprudence, that is, that our rules of procedure were not designed to create an injustice and added complications but, on the contrary, were devised and promulgated for the purpose of promoting reasonable uniformity in the expeditious and even administration of justice.
>
> [*Jen Elec., Inc. v. County of Essex,* 197 *N.J.* 627, 645, 964 *A.*2d 790 (2009) (internal citations omitted) ].

The court is satisfied that plaintiffs' motion is justiciable, given the clear and present harm affecting them. The court will therefore turn to the merits of plaintiffs' claims.

III. Plaintiffs Have Alleged Sufficient State Action to Support the Cognizability of their Equal Protection Claims Under the United States and New Jersey Constitutions.

The State's strongest argument on the constitutional claims is that any harm imposed on plaintiffs has been imposed by the federal government and not by the State. The question here then is, in light of *Windsor's* mandate that the federal government extend benefits to lawfully married same-sex couples, can the

actions by several federal agencies refusing to grant those same rights to civil union partners render the State liable for the resulting harm? To answer this question requires the court to wade into a thorny thicket with no clear precedential guide.

This court, speaking through Judge Feinberg, has already addressed the question of state action in the context of motions to dismiss the complaint. Plaintiffs had claimed that their civil union status affected their ability to obtain equal treatment from private parties such as hospitals and insurance companies. The State moved to dismiss, arguing that plaintiffs had failed to state an equal protection claim under either the New Jersey or United States Constitutions because the State had complied with the mandates of *Lewis* and had not engaged in any illegal state actions. Judge Feinberg noted that state action could be shown by alleging a deprivation "caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible." She continued, saying that, "if you build an infrastructure in which the result is a denial of benefits, that's state action." Transcript of Oral Argument at 19, *Garden State Equality v. Dow,* No. MER–L–1729–11 (Nov. 4, 2011); *see also Garden State Equality v. Dow,* No. MER–L–1729–11, 2012 *WL* 540608 at *10, 2012 *N.J.Super. Unpub. LEXIS* 360 at *29 (Law Div. Feb. 21, 2012) (written opinion by Judge Feinberg granting plaintiffs' motion to reconsider and reinstating plaintiffs' federal equal protection claim, holding that "[p]laintiffs allege the Civil Union Act and its enforcement by certain state officials, who are named the State, violates the Equal Protection Clause of the Fourteenth Amendment. At this juncture, the court is satisfied there is sufficient state action to permit the claim under the Federal Equal Protection Clause to proceed."). The court is now faced with the slightly different question of how the federal government, rather than private parties, deals with the state-created infrastructure of civil unions. Given this distinction, the court agrees with the State that Judge Feinberg's previous pronouncements as to state action are not the law of the case for present purposes. However, the court finds Judge

Feinberg's analysis persuasive as to whether the state's creation of a label for same-sex unions other than marriage is in and of itself enough to create state action where that label has concrete effects in regard to the eligibility of New Jersey civil union partners for federal benefits.

In the State's view, *Windsor* does not render New Jersey's parallel marriage and civil union structures invalid. Indeed, the State argues that it has not taken any illegal action since *Lewis* that requires a remedy. Rather, the State interprets *Windsor* to condemn only *federal* action that does not recognize civil unions as equivalent to marriage.[7] A key principle of Justice Kennedy's *Windsor* opinion is that "the Federal Government ... has deferred to state-law policy decisions with respect to domestic relations." *Windsor, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 2691, 186 *L.Ed.*2d at 825. Because the federal government incorporates state law definitions of marriage, the State contends, federal agencies must defer to New Jersey's Civil Union Act. That law requires that wherever "in any law, rule, regulation, judicial or administrative proceeding or otherwise, reference is made to 'marriage,' 'husband,' 'wife,' 'spouse,' 'family,' 'immediate family,' 'dependent,' 'next of kin,' 'widow,' 'widower,' 'widowed' or another word which in a specific context denotes a marital or spousal relationship, the same shall include a civil union." *N.J.S.A.* 37:1–33. The State argues that since domestic relations "has long been regarded as a virtually exclusive province of the States," the federal government must defer to New Jersey's definitions in the realm of domestic relations in determining whether individuals are married for the purposes of federal marriage benefits. *See Windsor, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 2691, 186 *L.Ed.*2d at 825. Indeed, Justice Kennedy's *Windsor* opinion makes clear that the federal government cannot deny benefits to individuals upon

---

[7] The *Lewis* decision addressed only claims under Article 1, Paragraph 1 of the New Jersey Constitution, and did not address any federal constitutional claims. As such, *Lewis* can only be read persuasively and not precedentially for a federal equal protection analysis.

whom a state has conferred marriage rights, "a dignity and status of immense import." *Id.* at ——, 133 *S.Ct.* at 2692, 186 *L.Ed.*2d at 826 ("What the State of New York treats as alike the federal law deems unlike by a law designed to injure the same class the State seeks to protect."). The State relies on this language to argue that because New Jersey deems civil unions to be equivalent to marriage, the federal government may not treat the two structures as distinct, and must provide marriage benefits to New Jersey couples in civil unions. Because providing federal benefits is solely the responsibility of the federal government, the State contends that the deprivation of such benefits cannot be viewed as state action. As a result, the State argues that plaintiffs' claims are not legally cognizable. In essence, the State argues that plaintiffs are seeking relief from the wrong defendant.

The State relies on precedents arising out of state spending clause obligations that have held that where the "onus of compliance" with individual rights is on the federal government, rather than on the state implementing the program, there is no cause of action under 42 *U.S.C.* § 1983 against that state. *See, e.g., Albiston v. Me. Comm'r of Human Services,* 7 *F.*3d 258, 263 (1st Cir.1993) (holding that if a federal funding statute places onus of compliance with its provisions on the federal government, and there is no direct obligation imposed upon the states, there is no cognizable § 1983 claim against the states). In the case before this court, by contrast, it is New Jersey's definitions of marriage, not the rights inherent in a federal statute, that are at issue. As noted in the *Windsor* opinion, the "definition and regulation of marriage ... has been treated as being within the authority and realm of the separate States." *Windsor, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 2689–90, 186 *L.Ed.*2d at 823.

Plaintiffs object to the argument that the State has not engaged in any action, arguing that the State's action is in creating a structure in which opposite-sex relationships and same-sex relationships are given distinct labels, labels that now matter in the context of federal benefits. According to plaintiffs, the *Windsor* decision to extend federal benefits to same-sex married couples

transformed what was, legally, a legitimate legislative choice under *Lewis* into impermissible state action under the *Lewis* mandate that same-sex couples be afforded the same marriage benefits as heterosexual couples. Plaintiffs point the court to a line of cases in which courts have held that where federal officials' application of a state intestacy law resulted in an unconstitutional denial of benefits, the underlying unconstitutional state law must be invalidated. *See, e.g., Daniels v. Sullivan,* 979 *F.*2d 1516, 1520 (11th Cir.1992) (holding that application of Georgia's intestacy scheme was unconstitutional as applied to plaintiff); *Handley v. Schweiker,* 697 *F.*2d 999, 1003 (11th Cir.1983) (holding Alabama's intestacy law unconstitutional as applied to plaintiff, as it created an "unconstitutional insurmountable barrier" to Social Security benefits). In these cases, however, the state laws were unconstitutional on their own, either facially or as applied to a specific plaintiff. By contrast, in this case, the court must decide whether a state statutory scheme is unconstitutional only because of the manner in which it is applied and incorporated by the federal government.[8]

 It is axiomatic that an equal protection claim under both the United States and New Jersey Constitutions requires state action. *See, e.g., Moose Lodge No. 107 v. Irvis,* 407 *U.S.* 163, 172, 92 *S.Ct.* 1965, 1971, 32 *L.Ed.*2d 627, 637 (1972) (citing *The Civil Rights Cases,* 109 *U.S.* 3, 3 *S.Ct.* 18, 27 *L.Ed.* 835 (1883)); *Doug Grant v. Greate Bay Casino Corp.,* 232 *F.*3d 173, 189 (3d Cir.2000), *cert. denied,* 532 *U.S.* 1038, 121 *S.Ct.* 2000, 149 *L.Ed.*2d 1003 (2001) (holding that plaintiff had no federal or New Jersey equal protection claim against casinos because they were not state actors). Much of the Supreme Court's jurisprudence regarding state action revolves around state involvement in otherwise private conduct.

___

[8] Plaintiffs have also pointed to *In re Estate of Kolacy,* 332 *N.J.Super.* 593, 598–99, 753 *A.*2d 1257 (Ch.Div.2003). There, the court held that it had jurisdiction to decide a state law intestacy issue that affected whether the plaintiff would be entitled to Social Security benefits. This case shows that New Jersey courts have jurisdiction to decide cases that may have the incidental consequence of determining eligibility for federal benefits.

*See Moose Lodge, supra,* 407 *U.S.* at 173, 92 *S.Ct.* at 1971, 32 *L.Ed.*2d at 637 ("Our holdings indicate that where the impetus for discrimination is private, the State must have significantly involved itself with invidious discrimination.") (citation omitted). In *Moose Lodge,* the Court held that there was no state action for the purposes of the Fourteenth Amendment where the State of Pennsylvania issued a liquor license to a private club that refused to serve an African American guest of one of its members. The Court wrote that, "[t]here is no suggestion in this record that Pennsylvania law, either as written or as applied, discriminates against minority groups either in their right to apply for club licenses themselves or in their right to purchase and be served liquor in places of public accommodation." *Id.* at 175–76, 92 *S.Ct.* 1965.

Neither party has pointed the court to an analogous situation where it is the manner in which the federal government applies a state statutory scheme that makes the state's actions unconstitutional. Nor has the court been able to find such a case. However, the reality of the deprivations faced by plaintiffs is that the State has indeed played a role in plaintiffs' alleged constitutional harms. By statutorily creating two distinct labels—marriage for opposite-sex couples and civil unions for same-sex couples—New Jersey civil union partners are excluded from certain federal benefits that legally married same-sex couples are able to enjoy. Consequently, it is not the federal government acting alone that deprives plaintiffs of federal marriage benefits—it is the federal government incorporating a state domestic relations structure to make its determinations, and it is that state structure that plaintiffs challenge in this motion. That structure may not have been illegal at the time it was created—indeed, the parallel marriage/civil union statutory scheme was specifically sanctioned in advance by *Lewis*—but it was certainly an "action" of the State.

By asserting that only the federal government, and not the State, has engaged in "action" that can be challenged by the plaintiffs, the State implies that since the parallel civil marriage and civil union structure was constitutional at the time the Civil

Union Act was passed, its passage does not constitute "state action" for the purposes of plaintiffs' challenge. The State has not relied on any case law supporting such a premise. In fact, it defies common sense to suggest that the passage of a statute by the New Jersey Legislature is not state action. *See Parks v. Mr. Ford*, 556 *F*.2d 132 (3d Cir.1977) ("Certainly the creation of law is state action.... The enactment of a statute ... must be recognized as state action in its purest form."). Indeed, for the purposes of establishing state action for an equal protection analysis, there is no need to reach the constitutionality of the challenged statutory scheme—the act of creating that statutory scheme is sufficient to constitute state action. *See Lugar v. Edmondson Oil Co.*, 457 *U.S.* 922, 941, 102 *S.Ct.* 2744, 2756, 73 *L.Ed.*2d 482, 498 (1982) ("While private misuse of a state statute does not describe conduct that can be attributed to the State, the procedural scheme created by the statute obviously is the product of state action."). And certainly when the State creates a statutory structure that relies on a particular application of federal law to remain constitutional, a change in that federal law cannot absolve the State from all responsibility for resulting constitutional violations. The court thus rejects the State's argument, and holds that the State engaged in state action when it created a statutory structure that, due to a change in federal law, now disadvantages civil union partners in New Jersey. It is that action-creating a statutory scheme that does not offer same-sex couples the right to civil marriage—that has been challenged by plaintiffs, and it will be analyzed for its validity under equal protection principles below.

Before reaching that analysis, however, the State makes further arguments that merit attention. The State points to search and seizure law cases, arguing that this court has no jurisdiction to require federal officials to act in conformity with the New Jersey Constitution. In the realm of search and seizure law, the New Jersey Supreme Court has held that "federal officers acting lawfully and in conformity to federal authority are unconstrained by the State Constitution." *State v. Knight*, 145 *N.J.* 233, 259, 678

*A*.2d 642 (1996) (citation omitted); *see also State v. Mollica,* 114 *N.J.* 329, 345, 554 *A*.2d 1315 (1989) ("With regard to law-enforcement activities, a state constitution ordinarily governs only the conduct of the state's own agents or others acting under color of state law."). *Mollica* set forth the principle that evidence obtained by federal agents acting on their own, in compliance with the United States Constitution, is admissible against a defendant even if it was obtained in violation of the New Jersey Constitution. *Mollica, supra,* 114 *N.J.* at 347–50, 554 *A*.2d 1315. The State argues that this limiting principle is rooted both in the Supremacy Clause of the federal constitution and in principles of federalism and must extend beyond search and seizure. *See, e.g., McCullough v. Maryland,* 17 *U.S.* 316, 417, 4 *Wheat.* 316, 4 *L.Ed.* 579, 604 (1819) (holding that State of Maryland could not specifically target Bank of the United States for taxation). The State, however, when questioned at oral argument, could not point to any cases outside of the search and seizure context to support its analysis. Moreover, in the case of search and seizure law, the New Jersey Supreme Court has also held that evidence seized by federal officials in violation of the New Jersey Constitution will remain inadmissible if those federal officials were acting "under color of state law or as agents of state law-enforcement authorities." *Mollica, supra,* 114 *N.J.* at 356, 554 *A*.2d 1315. Thus, when the State is involved, there is state action.

The State further argues that *Lewis* itself disavowed the notion that the State constitutional right identified by that Court extended to federal action or statutes. *See Lewis, supra,* 188 *N.J.* at 460 n. 25, 908 *A*.2d 196 ("We note that what we have done and whatever the legislature may do will not alter federal law, which only confers marriage rights and privileges to opposite-sex married couples."). In that footnote, the *Lewis* Court specifically cited Section 3 of DOMA. This court reads this statement differently than the State. The *Lewis* Court was noting the limitations and context of its decision, rather than explicitly limiting its decision to whether same-sex couples were entitled to state benefits. Anything the New Jersey Supreme Court did in 2006 could

not change federal law in regard to same-sex couples. Nor is there any other language in *Lewis* that limits the opinion to New Jersey rights and benefits. *Id.* at 457, 908 *A.*2d 196 ("We now hold that under the equal protection guarantee of [the New Jersey Constitution], committed same-sex couples must be afforded on equal terms the same rights and benefits enjoyed by married opposite-sex couples.").

Justice Kennedy stated quite clearly in the last sentence of *Windsor* that "[t]his opinion and its holding are confined to those lawful marriages." *Windsor, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 2696, 186 *L.Ed.*2d at 830. A "[s]tate's decision to give this class of persons the right to marry conferred upon them a dignity and status of immense import[,]" a status to which the federal government must give deference. *Id.* at ——, 133 *S.Ct.* at 2705, 186 *L.Ed.*2d at 826. Plaintiffs do not allege here that the State must force the federal government to provide benefits to couples in civil unions. Rather, they allege that the violation of their constitutional rights derives from a state action, that of creating separate systems of marriage and civil unions, dependent upon sexual orientation. This court holds that creation of a status that affects whether same-sex couples can access federal benefits constitutes action on the part of the State. The detriments plaintiffs experience can be traced directly to a state action—that of enacting the Civil Union Act rather than allowing same-sex marriage. As such, the court finds sufficient state action to make plaintiffs' causes of action legally cognizable under both the United States and New Jersey Constitutions.

IV. In the Wake of the *Windsor* Decision, Plaintiffs Have Shown That Civil Union Partners in New Jersey Are Being Denied Equal Access to Federal Benefits, Thus Requiring That the Right to Marry be Extended to Same–Sex Couples Under the Equal Protection Guarantee of the New Jersey Constitution.

Article I, Paragraph 1 of the New Jersey Constitution provides that, "[a]ll persons are by nature free and independent,

and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." Although Article I, Paragraph 1 does not expressly contain the term "equal protection," New Jersey courts "have construed the expansive language of that provision as guaranteeing [that] fundamental right." *Caviglia, supra*, 178 *N.J.* at 472, 842 *A.*2d 125 (citing *Greenberg v. Kimmelman*, 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985)). An analysis of the right to equal treatment under the New Jersey Constitution differs slightly from the federal three-tiered equal protection analysis. *Greenberg, supra*, 99 *N.J.* at 569, 494 *A.*2d 294. The court must balance: (1) the nature of the affected right; (2) the extent to which the governmental restriction intrudes upon it; and (3) the public need for the restriction. *Lewis, supra*, 188 *N.J.* at 444, 908 *A.*2d 196 (citing *Greenberg, supra*, 99 *N.J.* at 567, 494 *A.*2d 294). Where a statute is challenged because it "does not apply evenhandedly to similarly situated people," the means selected by the Legislature must "bear a substantial relationship to a legitimate government purpose." *Lewis, supra*, 188 *N.J.* at 443, 908 *A.*2d 196; *see also Caviglia, supra*, 178 *N.J.* at 472–74, 842 *A.*2d 125 (holding that New Jersey statute barring uninsured drivers from recovery of noneconomic damages resulting from automobile accidents did not violate New Jersey's equal protection guarantee, as it was a reasonable attempt by Legislature to deter drunk driving, the use of automobiles as weapons, and the uninsured use of automobiles). A "real and substantial relationship between the classification and the governmental purpose which it purportedly serves" must be shown to sustain the classification. *Barone v. Dep't of Human Servs.*, 107 *N.J.* 355, 368, 526 *A.*2d 1055 (1987) (citation omitted) (holding that New Jersey's Pharmaceutical Assistance Act, which granted benefits to financially eligible disabled residents under sixty-five who received certain social security payments, rationally advanced legitimate governmental objective, that of continuing the program's fiscal integrity and maximizing the funds used to provide benefits); *see also Trautmann v. Christie*, 211 *N.J.* 300, 305,

48 *A*.3d 1005 (2012) (upholding a New Jersey law that required drivers with certain permits and probationary licenses to display decals on their vehicles, as the "State has a vital and compelling interest in maintaining highway safety by ensuring that only qualified drivers operate motor vehicles") (citation omitted).

The Supreme Court addressed the application of the New Jersey Constitution's equal protection guarantee to same-sex couples in *Lewis, supra,* 188 *N.J.* 415, 908 *A*.2d 196. The Court engaged in the traditional three-part balancing test described above, and applied the "real and substantial relationship" standard. The Court concluded by setting forth a clear rule: under the New Jersey Constitution, same-sex couples must be provided all of the rights and benefits of marriage. *Id.* at 463, 908 *A*.2d 196. Now, as a result of the *Windsor* decision and the subsequent federal implementation of that decision by federal agencies refusing to extend marital benefits to civil union couples, this court must decide how to apply *Lewis,* which remains good law. Indeed, neither side here questions the binding nature of *Lewis* on this court. As a result, the equal protection analysis under the New Jersey Constitution in this case simply requires an application of the *Lewis* mandates in light of the changed circumstances brought about by *Windsor.*

## A. Requirements of *Lewis.*

In *Lewis, supra,* 188 *N.J.* 415, 908 *A*.2d 196, the New Jersey Supreme Court addressed whether Article I, Paragraph 1 of the New Jersey Constitution requires that committed same-sex couples who wish to marry be given the same legal benefits, privileges, and title of marriage as opposite-sex couples. The Court addressed whether committed same-sex couples had a constitutional right to the benefits and privileges afforded to married heterosexual couples under the equal protection guarantees of the New Jersey Constitution, and answered that question with a resounding "yes" that garnered unanimous approval from every member of the Court. The Court then considered whether the

Domestic Partnership Act (DPA), which distinguished between opposite-sex and same-sex couples, and provided those same-sex couples with some but not all of the rights of marriage, violated the principle of equal rights and benefits for same-sex couples. *Id.* at 447–51, 908 *A.*2d 196. The Court noted that although the DPA provided some rights to same-sex couples, there were many marriage benefits that were still denied to same-sex couples, including ownership of property by tenancy of the entirety, certain survivor benefits, back wages owed to deceased spouses, various tuition assistance programs, tax deductions for medical expenses, the testimonial privilege, and more. *Id.* at 448–49, 908 *A.*2d 196. In addition, the Court held that there was little to no public need for denying same-sex couples the rights and privileges of marriage. *Id.* at 452, 908 *A.*2d 196. The State had defended its statutory scheme by arguing a need to sustain the traditional definition of marriage, but the Court found that argument unpersuasive in the context of whether couples were entitled to the rights of marriage rather than the label of marriage. *Id.* at 452, 908 *A.*2d 196. Indeed, the Court held that, "[t]here is no rational basis for, on the one hand, giving gays and lesbians full civil rights in their status as individuals, and, on the other, giving them an incomplete set of rights when they follow the inclination of their sexual orientation and enter into committed same-sex relationships." *Ibid.* Moreover, the Court succinctly stated that:

> Ultimately, we have the responsibility of ensuring that every New Jersey citizen receives the full protection of our State Constitution. In light of plaintiffs' strong interest in rights and benefits comparable to those of married couples, the State has failed to show a public need for disparate treatment. We conclude that denying to committed same-sex couples the financial and social benefits and privileges given to their married heterosexual counterparts bears no substantial relationship to a legitimate governmental purpose.
>
> [*Id.* at 457, 908 *A.*2d 196.]

The Court concluded that, "the unequal dispensation of rights and benefits to committed same-sex partners can no longer be tolerated under our State Constitution." *Id.* at 423, 908 *A.*2d 196.

By a 4–3 vote, however, the Court rejected the claim of the *Lewis* plaintiffs that there is a fundamental right to same-sex

marriage under the due process guarantees of the New Jersey Constitution. The Court examined the evolving expansion of rights for LGBT individuals in New Jersey, noting that New Jersey prohibits discrimination on the basis of sexual orientation, and has been at the forefront of recognizing parental rights of same-sex partners. *Id.* at 444, 908 *A.*2d 196. Because the *Lewis* Court found that same-sex couples were entitled to all of the rights and benefits of marriage, the Court did not reach the question of whether New Jersey's Constitution requires giving committed same-sex couples the label of marriage, writing that "[a] proper respect for a coordinate branch of government counsels that we defer until it has spoken." *Id.* at 460, 908 *A.*2d 196. Thus, the Court deferred to the Legislature to determine how to provide all of the rights and benefits of marriage to same-sex couples, whether by parallel statutory scheme or by including same-sex unions within the definition of marriage. *Id.* at 457–59, 908 *A.*2d 196. The Court noted that, "[a]s long as the classifications do not discriminate arbitrarily between persons who are similarly situated, the matter is one of legislative prerogative." *Id.* at 459, 908 *A.*2d 196. The Legislature was given 180 days from the date of the decision to make a choice between creating a parallel statutory structure or extending marriage to same-sex couples. *Id.* at 463, 908 *A.*2d 196.

At the time of the Court's decision in 2006, only Connecticut and Vermont provided for same-sex civil unions, and Massachusetts provided for same-sex marriage. *Id.* at 454, 908 *A.*2d 196. In the wake of *Lewis,* the New Jersey Legislature adopted the Civil Union Act, thereby making New Jersey the fourth state to extend the rights and benefits of marriage to same-sex couples.

> B. The Constitutionality of New Jersey's Decision
> to Deny Same–Sex Couples the Label of
> "Marriage" Post-*Windsor.*

In *Windsor,* the Supreme Court of the United States struck down Section 3 of the Defense of Marriage Act, which had defined marriage as between one man and one woman for the

purposes of federal statutes, rules, and regulations. *Windsor, supra,* —— *U.S.* ——, 133 *S.Ct.* 2675, 186 *L.Ed.*2d 808. *Windsor* held that the State of New York had elected to give same-sex couples the right to marry, and therefore, "conferred upon them a dignity and status of immense import." *Id.* at ——, 133 *S.Ct.* at 2681, 186 *L.Ed.*2d at 826. DOMA was found unconstitutional because it singled out "a class of persons deemed by a State entitled to recognition and protection to enhance their own liberty" and "impose[d] a disability on the class by refusing to acknowledge a status the State finds to be dignified and proper." *Id.* at ——, 133 *S.Ct.* at 2695–96, 186 *L.Ed.*2d at 830. As a result of the *Windsor* decision, legally married same-sex couples will have access to the rights and privileges contained in the approximately 1,000 statutes and federal regulations that make reference to a person's marital status. *Id.* at ——, 133 *S.Ct.* at 2683, 186 *L.Ed.*2d at 816.[9]

Plaintiffs argue that in the wake of the *Windsor* decision, the labels of "marriage" and "spouse" denied to same-sex couples by the terms of the Civil Union Act are no longer mere words. That Act defines "civil unions" as the "legally recognized union of two eligible individuals of the same sex" who "shall receive the same benefits and protections and be subject to the same responsibilities as spouses in a marriage." *N.J.S.A.* 37:1–29. In addition, an individual in a civil union is called a "partner in a civil union couple." *N.J.S.A.* 37:1–29. Plaintiffs argue that because federal statutes and regulations use the terms "marriage" and "spouse," the federal benefits that would be available to them if they were lawfully married are not available to them as partners in a civil

---

[9] Not raised as an issue here is the distinction sometimes made in federal statutes referencing marriage between the state of celebration (where the marriage took place) and the state of domicile (where the couple lives). *Compare* Rev. Ruling 2013–17 (2013) *with* 38 *U.S.C.* § 103(c) (state of domicile rule for veterans' benefits); 17 *U.S.C.* § 101 (copyrights); 29 *C.F.R.* § 825.122 (FMLA). It is possible that same-sex couples in New Jersey who get married in a different state (*i.e.,* New York or Delaware), may be eligible for those federal benefits if the agencies rely on the state of celebration for eligibility for marriage benefits.

union. As such, plaintiffs contend that the parallel structures of marriage and civil unions in New Jersey no longer comport with the New Jersey Constitution under the holding of *Lewis* because, in order for same-sex couples to access all of the rights and benefits of marriage, New Jersey must allow them to legally define their relationships as marriage.

In response to plaintiffs' arguments under *Lewis* post-*Windsor*, the State argues that *Windsor* in fact mandates that same-sex couples in civil unions receive the same federal benefits to which married couples are entitled. The State points to the language, reasoning, and holding of the *Windsor* decision, arguing that it must be interpreted to afford same-sex couples in civil unions all of the same federal benefits as married couples. The State argues that *Windsor* acknowledges same-sex civil unions as equivalent to same-sex marriages. *See Windsor, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 2683, 186 *L.Ed.*2d at 816 ("[DOMA's] definitional provision does not by its terms forbid States from enacting laws permitting same-sex marriages or civil unions or providing state benefits to residents in that status."); *Id.* at ——, 133 *S.Ct.* at 2692, 186 *L.Ed.*2d at 826–27 ("By its recognition of the validity of same-sex marriages performed in other jurisdictions and then by authorizing same-sex unions and same-sex marriages, New York sought to give further protection and dignity to that bond."). However, these two references to civil unions do not equate civil unions to marriage, but rather reference the facts that DOMA did not prevent states from enacting civil union *or* marriage statutes, and that New York recognized same-sex civil unions prior to recognizing same-sex marriages. Indeed, both references emphasize the distinction between the two statuses, rather than their equivalence.

In essence, the State attempts to foist all constitutional responsibility for the ineligibility of civil union couples for some federal benefits on the federal government, arguing that it is the federal government that is improperly not deferring to state law definitions and is therefore violating plaintiffs' constitutional rights. The State's argument is essentially a reiteration, on the merits, of

its argument that "plaintiffs have sued the wrong defendant," which the State raised when contending that there is no state action here. The State argues that since domestic relations are an area that has "long been regarded as a virtually exclusive province of the States," the federal government will and must look to the law of New Jersey to decide who is husband and wife or parent and child.[10] *Windsor, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 2691, 186 *L.Ed.*2d at 814. Because the Civil Union Act, *N.J.S.A.* 37:1–33, requires that whenever legal reference is made to marriage, husband, wife, spouse, family, and so on, "the same shall include a civil union," the State contends that the federal government must recognize a civil union as a marriage and partners to that civil union as spouses for the purposes of federal benefits.

The New Jersey Attorney General's view, however, is not binding on the federal government, which has already acted through several agencies to exclude civil union partners from eligibility for federal marital benefits. As discussed above, the Office of Personnel Management, Department of State, the Department of Labor, the Internal Revenue Service, and the Centers for Medicaid and Medicare, have stated that they will not be recognizing civil unions, and rather will be confining eligibility for benefits to spouses in lawful marriages. Notably, many of the pronouncements establishing these policies mention consultation

---

[10] In support of this proposition, the State points to a recent decision, *Cozen O'Connor, P.C. v. Tobits,* 56 *Emp. Ben. Cas.* (BNA) 1213, 2013 *WL* 3878688 (E.D.Pa. July 29, 2013). There, the court noted that if a state—Illinois—recognizes a party as the "surviving spouse" for the purposes of ERISA benefits, the federal government must do the same. However, the State's reliance on this case is misguided. In *Cozen,* the court noted that an Illinois probate court had specifically determined that under state law, the plaintiff, who was legally married to her partner in Canada, was the "surviving spouse" of her partner. This holding led to the determination in *Cozen* that the plaintiff was also the "surviving spouse" under the ERISA plan. In this case, however, the issue is that, unlike that Illinois probate court, New Jersey expressly denies use of the label "spouse" to same-sex couples. *Cozen* involved federal deference to Illinois's inclusive definition of "spouse" for a determination of federal benefits; here, New Jersey's exclusive definition of "spouse" is challenged as violative of the New Jersey Constitution.

with the Attorney General of the United States. It is fair to infer, then, that legal advice was provided to these agencies regarding the appropriate application of the *Windsor* decision. Indeed, these policies are consistent with the explicit language of *Windsor* limiting its reach to same-sex couples legally married in states authorizing such unions: "[t]his opinion and its holding are confined to those lawful marriages." *Windsor, supra,* —— *U.S.* at ——, 133 *S.Ct.* at 2696, 186 *L.Ed.*2d at 830. Moreover, the recent federal pronouncements have the benefit of consistent and straightforward application. There is, for example, no commonly understood definition of what a "civil union" means. Different states use the term differently. *Compare N.J.S.A.* 37:1–29 (defining "civil union" as a union between members of the same sex) *with* 750 *Il. Comp. Stat.* 75/10 (2013) (defining "civil union" as a union between any persons, including those of the same or opposite sex). And California used the term "domestic partnership" to confer the rights of marriage on same-sex partners before recent court action required that marriage be extended to same-sex couples. *Cal. Fam.Code* § 297 to –299.6 (Deering 2013); *see also Hollingsworth, supra,* —— *U.S.* ——, 133 *S.Ct.* 2652, 186 *L.Ed.*2d 768.

 While it is true that one of the potential remedies that exists to cure the harm identified by plaintiffs is for the federal government to recognize New Jersey civil unions as equivalent to marriage for the purpose of all federal marital rights, privileges and benefits, that remedy is beyond the jurisdiction of this court to compel and would likely require plaintiffs to initiate a multitude of lawsuits with uncertain outcomes or wait indefinitely for Congress to act. Indeed, counsel for the State specifically noted at oral argument that the State itself cannot bring an action against the federal government under its *parens patriae* powers seeking equal treatment for New Jersey civil union couples.[11] Conse-

---

[11] The *parens patriae* doctrine precludes a State from initiating a lawsuit without a "quasi-sovereign" interest of its own. *Alfred L. Snapp & Son v. P.R.,* 458 *U.S.* 592, 600, 102 *S.Ct.* 3260, 3265, 73 *L.Ed.*2d 995, 1003 (1982).

quently, the litigation burden to challenge the policies and determinations of federal agencies that exclude civil union partners would fall squarely on the shoulders of same-sex couples in New Jersey. According to the State, it would be up to plaintiffs to challenge every agency rule, regulation, and policy that does not provide civil union partners equal access to federal marriage benefits. Addressing a similar circumstance under the Domestic Partnership Act, the *Lewis* Court noted the "costly and time consuming" processes for adoption required of same-sex partners that was not required of opposite-sex married couples. The discriminatory burden of that litigation cost was just one of the inequalities the *Lewis* Court sought to redress. Similarly, the United States Supreme Court noted in *Troxel v. Granville*, 530 *U.S.* 57, 75, 120 *S.Ct.* 2054, 2065, 147 *L.Ed.*2d 49, 62 (2000), that "the litigation costs incurred by Granville on her trip through the Washington court system and to this Court are without a doubt already substantial" and remanding would force "the parties into additional litigation that would further burden Granville's parental right." Here too, plaintiffs would suffer hardship in the form of a costly and time-consuming litigation burden not required of opposite-sex married couples should this court withhold review and insist that plaintiffs pursue benefit-by-benefit litigation against the federal agencies. Were plaintiffs forced to wait for the results of federal litigation or congressional action, they would remain ineligible for many federal marital benefits, all while expending time and money on piecemeal litigation that may or may not be successful and may or may not produce uniform rulings. Such a result is inconsistent with the equality of benefits guaranteed to same-sex couples by *Lewis*.

The State acknowledged in its brief that "a sizeable, *but indeterminate*, number of the over 1,000 benefits and responsibilities that were inapplicable to civil union couples because of DOMA are now available to them." (emphasis added).[12] However, *Lewis* counsels

---

[12] The efficacy of this assertion is belied somewhat by the fact that the majority of federal agencies announcing policies post-*Windsor* have limited federal bene-

that "committed same-sex couples must be afforded on equal terms the same rights and benefits enjoyed by married opposite-sex couples." *Lewis, supra,* 188 *N.J.* at 415, 908 *A.*2d 196. Not a sizeable amount of the benefits, but *all* of the same benefits. Every day that the State does not allow same-sex couples to marry, plaintiffs are being harmed, in violation of the clear directive of *Lewis. See Elrod, supra,* 427 *U.S.* at 373, 96 *S.Ct.* at 2690, 49 *L.Ed.*2d at 565 (holding that the loss of First Amendment freedoms, even for a short period of time, "unquestionably constitutes irreparable injury"). Plaintiffs are ineligible for many federal marital benefits at this moment, and their right to equal protection under the New Jersey Constitution should not be delayed until some undeterminable future time. In the face of an injury of constitutional proportions, the court must act to ensure the continuing vitality of *Lewis.*

While the current New Jersey statutory structure challenged by plaintiffs had been in place for years before *Windsor* was decided, the court cannot ignore that the State's current system of classification assigns to same-sex couples a label distinct from marriage—a label that now directly affects the availability of federal marriage benefits to those couples. Following the *Windsor* decision of the United States Supreme Court and the subsequent implementation of that decision by several federal agencies, same-sex couples are only afforded the same rights and benefits enjoyed by opposite-sex married couples if they are married. Since New Jersey currently denies marriage to same-sex couples, same-sex

---

fits to legally married same-sex couples. Moreover, if, as the State argues, same-sex couples are *already* entitled to federal benefits after *Windsor,* there would be no need for Congress to consider proposed legislation that would extend federal benefits to civil union couples. *See, e.g., Federal Benefits Equality Act,* H.R. 2834, 113th Cong., 1st Sess. (2013); *Act to Provide Certain Benefits to Domestic Partners of Federal Employees,* H.R. 3135, 113th Cong. (2013); Press Release, Senator Tammy Baldwin, U.S. Senators Tammy Baldwin and Susan Collins Introduce Bipartisan Legislation to Provide Fairness to Domestic Partners (Sept. 19, 2013), *available at* http://www.baldwin.senate.gov/press-releases/us-senators-tammy-baldwin-and-susan-collins-introduce-bipartisan-legislation-to-provide-fairness-to-domestic-partners (as cited by the State in its supplemental briefing).

civil union partners in New Jersey are ineligible for many federal marital benefits. The parallel legal structures created by the New Jersey Legislature therefore no longer provide same-sex couples with equal access to the rights and benefits enjoyed by married heterosexual couples, violating the mandate of *Lewis* and the New Jersey Constitution's equal protection guarantee. Under these circumstances, the current inequality visited upon same-sex civil union couples offends the New Jersey Constitution, creates an incomplete set of rights that *Lewis* sought to prevent, and is not compatible with "a reasonable conception of basic human dignity." *Lewis, supra,* 188 *N.J.* at 452, 908 *A.*2d 196. Any doctrine urging caution in constitutional adjudication is overcome by such a clear denial of equal treatment.

Because plaintiffs, and all same-sex couples in New Jersey, cannot access many federal marital benefits as partners in civil unions, this court holds that New Jersey's denial of marriage to same-sex couples now violates Article 1, Paragraph 1 of the New Jersey Constitution as interpreted by the New Jersey Supreme Court in *Lewis.* The equality demanded by *Lewis* now requires that same-sex couples in New Jersey be allowed to marry. As a result, the court will grant plaintiffs' motion for summary judgment and will order the State to permit any and all same-sex couples, who otherwise satisfy the requirements for civil marriage, to marry in New Jersey.

Since plaintiffs have shown an equal protection violation of the New Jersey Constitution that will be remedied by the court's order requiring the State to provide same-sex couples with access to civil marriage, the court will not pass upon the constitutionality of the Civil Union Act itself. Indeed, plaintiffs' complaint asks for declaratory and injunctive relief holding that same-sex couples have the right to marry and does not specifically request invalidation of the Civil Union Act. Moreover, because the court's ruling is based on New Jersey constitutional grounds and provides the relief sought by plaintiffs, the court will not reach their federal equal protection claim. Guided by the principle that "courts of

this state will not determine constitutional questions unless absolutely imperative to resolve issues in litigation," the court will enter final judgment in favor of plaintiffs on the State constitutional claim set forth in count one, and will dismiss the federal constitutional claim set forth in count three as moot. *Shabazz v. N.J. Dep't of Corr.*, 385 *N.J.Super.* 117, 121–22, 896 *A.*2d 473 (App.Div.2006) ("A case is moot if the disputed issue was resolved, at least with respect to the parties who instituted the litigation.") (quoting *Advance Inc. v. Montgomery Twp.*, 351 *N.J.Super.* 160, 166, 797 *A.*2d 216 (App.Div.2002)); *City of Camden v. Whitman*, 325 *N.J.Super.* 236, 243, 738 *A.*2d 969 (App.Div.1999); *Worthington v. Fauver*, 88 *N.J.* 183, 192, 440 *A.*2d 1128 (1982) ("an unnecessary decision on constitutional issues should be avoided."). Therefore, summary judgment will be granted for plaintiffs as to count one of the complaint, count three will be dismissed as moot, and final judgment will be entered in favor of plaintiffs.

To allow the State adequate time to prepare to effectuate this ruling or to pursue appellate remedies, the court directs that it take effect on October 21, 2013.

## CONCLUSION

Plaintiffs' motion for summary judgment is granted. Under the New Jersey Supreme Court's opinion in *Lewis, supra*, 188 *N.J.* 415, 908 *A.*2d 196, same-sex couples are entitled to the same rights and benefits as opposite-sex couples. The *Lewis* Court held that the New Jersey Constitution required the State to either grant same-sex couples the right to marry or create a parallel statutory structure that allows those couples to obtain *all* the same rights and benefits that are available to opposite-sex married couples. The New Jersey Legislature chose the latter option when it adopted the Civil Union Act. Since the United States Supreme Court decision in *Windsor, supra*, —— *U.S.* ——, 133 *S.Ct.* 2675, 186 *L.Ed.*2d 808, invalidated the Defense of Marriage Act, several federal agencies have acted to extend marital benefits to same-sex married couples. However, the majority of those agencies have

not extended eligibility for those benefits to civil union couples. As a result, New Jersey same-sex couples in civil unions are no longer entitled to all of the same rights and benefits as opposite-sex married couples. Whereas before *Windsor* same-sex couples in New Jersey would have been denied federal benefits regardless of what their relationship was called, these couples are now denied benefits solely as a result of the label placed upon them by the State.

The ineligibility of same-sex couples for federal benefits is currently harming same-sex couples in New Jersey in a wide range of contexts: civil union partners who are federal employees living in New Jersey are ineligible for marital rights with regard to the federal pension system, all civil union partners who are employees working for businesses to which the FMLA applies may not rely on its statutory protections for spouses, and civil union couples may not access the federal tax benefits that married couples enjoy. And if the trend of federal agencies deeming civil union partners ineligible for benefits continues, plaintiffs will suffer even more, while their opposite-sex New Jersey counterparts continue to receive federal marital benefits for no reason other than the label placed upon their relationships by the State. This unequal treatment requires that New Jersey extend civil marriage to same-sex couples to satisfy the equal protection guarantees of the New Jersey Constitution as interpreted by the New Jersey Supreme Court in *Lewis*. Same-sex couples must be allowed to marry in order to obtain equal protection of the law under the New Jersey Constitution.